[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 18, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-10657

_____

D. C. Docket No. 04-00312-CV-LSC-W

NIMBUS TECHNOLOGIES, INC.,

Plaintiff-Appellant,

versus

SUNNDATA PRODUCTS, INC., et al.,

Plaintiffs,

EZ LED, L.L.C.,
RAY WELCHEL,
DAVID TARASEVICH,
MR. AARON GEER,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(April 18, 2007)**

Before BIRCH and BLACK, Circuit Judges, and MILLS,[*] District Judge.

BIRCH, Circuit Judge:

This appeal arises out of a dispute involving a "Tooling Purchase Agreement" entered into by Plaintiff-appellant Nimbus Technologies, Inc. and non-party SunnData Products, Inc.; certain purchase orders related to that agreement; and the circumstances surrounding the dissolution of SunnData and organization of EZ LED LLC and EZ LED, Inc. Nimbus appeals from the district court's grant of summary judgment in favor of defendants Aaron Geer, David Tarasevich, EZ LED LLC, Ray Whelchel, and Steven Whelchel on Nimbus's claim for intentional interference with business relations. Nimbus also appeals the district court's holding that Nimbus may not hold Geer accountable for the judgment against SunnData by "piercing the corporate veil." For the reasons set forth below, we AFFIRM the district court's grant of summary judgment in favor of the defendants on both issues.

## I. BACKGROUND

Nimbus is a North Carolina corporation that manufactures specialized electronic equipment. SunnData, owned by Ray Whelchel, was an Alabama corporation incorporated in January 2002, that sought to establish itself in the

---

[*] Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

light-emitting diode (LED) industry.[1]  EZ LED, Inc. was an Alabama corporation incorporated in June 2003, and EZ LED LLC was an Alabama limited liability company organized in June 2003.  Whelchel and Tarasevich were the sole participants in EZ LED LLC.  Tarasevich was also a business advisor to SunnData and Geer.  Geer was a creditor of SunnData and EZ LED LLC, lending SunnData approximately $117,000, and EZ LED LLC over $300,000.

In 1999 and 2000, SunnData was producing LEDs and attempting to gain a foothold in the LED industry, although at that time it had limited sales and few assets.  In 2001, Whelchel of SunnData met John Weir, the owner of Nimbus, which was in the business of outsourcing for specialized electronics manufacturing.  Whelchel and Weir held discussions regarding the assembly of various colored LED products that were already on the market, and Nimbus began manufacturing those products for SunnData.

SunnData believed that the key to success in the LED industry was to develop a "true white" LED.  In early 2002, SunnData held discussions with the Robert G. Allen Company ("RGA") regarding the development of a true white LED.  RGA displayed sample white LEDs that appeared to be of high quality and were supposedly made from prototype tooling, but RGA requested $50,000 to

---

[1] SunnData was in operation as early as 1999, but was not incorporated until January, 2002.

develop the tooling fully. Because SunnData did not have the necessary capital to fund RGA's development of the white LED tooling, it approached Nimbus about entering into an agreement to fund RGA's development of the white LED tooling.

Nimbus and SunnData subsequently entered into a Tooling Purchase Agreement ("TPA"), whereby Nimbus agreed to pay RGA the $50,000 requested to develop the white LED tooling, and SunnData agreed to reimburse Nimbus the $50,000 plus an additional $100,000. Once developed, the tooling would be the property of Nimbus until SunnData paid Nimbus the $150,000. After SunnData paid Nimbus, the tooling was to become the property of SunnData.

After the parties executed the TPA, Nimbus paid RGA $50,000, as contemplated in the agreement. RGA obtained white LEDs that SunnData believed were of poor quality and did not conform to the samples RGA had previously shown SunnData. RGA did not develop any tooling for the manufacture of white LEDs, and subsequently filed bankruptcy without refunding Nimbus any of the $50,000. Because RGA did not develop the tooling, SunnData did not pay Nimbus the $150,000 contemplated in the TPA.

Without the tooling for the white LED, SunnData was faced with insolvency. It had no significant revenue from sales, and was surviving on

periodic infusions of cash from Geer.[2]  Geer insisted that SunnData consult a

business expert, and he recommended Tarasevich due to his manufacturing

experience.  Tarasevich conducted a due diligence inquiry into the LED market and

the operational status of SunnData.  He concluded that Whelchel should wind

down SunnData due to potential liability related the sales of poor quality products,

and because a new white LED product would have to be developed using new

tooling technology.  Thereafter, Geer refused to lend further money to SunnData.

Tarasevich recommended forming two new companies to produce and

market the planned white LED product.  In June, 2003, Whelchel and Tarasevich

formed EZ LED LLC and EZ LED, Inc.  EZ LED, Inc. was to manufacture a white

LED product, and EZ LED LLC was to market the product.  That month, pursuant

to a written purchase agreement, SunnData sold its assets to EZ LED LLC for

approximately $113,000 in cash plus the assumption of certain liabilities, for a

total of $477,133.  The assets included computer and office equipment, a car, all

intellectual property of SunnData, and some inventory.  Tarasevich testified that he

believed this was only an asset sale, and that EZ LED LLC did not assume

SunnData's liabilities, though it did agree to assume certain debts, including

money owed to Geer and Charlotte Stanford, a SunnData investor.  EZ LED LLC

---

[2] Geer loaned SunnData a total of approximately $117,000 over the course of his involvement with the company.

5

and EZ LED, Inc. operated out of the same space as SunnData, and used the same telephone and fax numbers and email address, but had different management and ownership than SunnData.

Geer loaned $300,000 to EZ LED LLC, and Tarasevich acted as manager of the company. Geer testified that though he believed his loan could later be converted into membership shares in the LLC, such a conversion never took place. Eventually, EZ LED LLC and EZ LED, Inc. became insolvent, and Geer "foreclosed" on certain assets owned by EZ LED LLC by physically taking possession of them and removing them from EZ LED LLC's offices.

At the time EZ LED LLC and EZ LED Inc. went out of business, Nimbus still had invoices outstanding on products ordered by SunnData. Nimbus brought suit in an attempt to recover the $150,000 it believes it is owed under the TPA, as well as money due under the unpaid invoices. Nimbus named SunnData, Ray and Steven Whelchel, Geer, Tarasevich, EZ LED LLC, and EZ LED, Inc. in a complaint seeking recover on a number of theories, including, inter alia, intentional interference with business relations and seeking to pierce the corporate veil to hold all defendants liable for SunnData's debts. SunnData and EZ LED, Inc. failed to answer, and Nimbus obtained a $612,333 default judgment against them.

The remaining defendants filed motions for summary judgment, which were

6

granted except to the extent any defendants continued to hold assets transferred from SunnData. The district court also denied Ray Whelchel's motion for summary judgment as to Nimbus's attempt to pierce the corporate veil, but granted summary judgment in favor of the other defendants on that issue, holding that only persons with an ownership interest in SunnData could be held accountable for its obligations. Nimbus appeals the district court's holding that Geer, as a creditor, may not be held liable under a theory of piercing the corporate veil, and also appeals the court's grant of summary judgment in favor of the defendants on Nimbus's claim for intentional interference with business relations.

## II. DISCUSSION

"We review a district court's grant of summary judgment de novo, applying the same legal standards as the district court . . . ." Arrington v. Helms, 438 F.3d 1336, 1341 (11th Cir. 2006) (citation omitted). We view all facts and draw all reasonable inferences in the light most favorable to the non-moving party. Id. Summary judgment is appropriate if the evidence shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

A. Piercing the Corporate Veil as to a Creditor

Under Alabama law, "it is basic that a corporation is a distinct and separate

entity from the individuals who compose it as stockholders or who manage it as directors or officers." Cohen v. Williams, 318 So. 2d 279, 281 (Ala. 1975) (citation omitted). The corporate form may be set aside, however, "as a means of preventing injustice or inequitable consequences." Co-Ex Plastics, Inc. v. AlaPak, Inc., 536 So. 2d 37, 38 (Ala. 1988) (citation omitted). The Alabama Supreme Court has stated that "[a] separate corporate existence will not be recognized when a corporation is so organized and controlled and its business so conducted as to make it a mere instrumentality of another or the alter ego of the person owning and controlling it." Id.; see also Culp v. Econ. Mobile Homes, Inc., 895 So. 2d 857, 859 (Ala. 2004) ("In certain situations the corporate entity will be disregarded and limited stockholder liability will be denied.") (citation omitted); Messick v. Moring, 514 So. 2d 892, 894 (Ala. 1987) ("[T]he corporate entity will be disregarded when it is used solely to avoid a personal liability of the owner . . . .") (citation omitted).

Nimbus argues that a creditor may be held liable under the theory of piercing the corporate veil if the creditor exercised control over the corporation at issue, and contends that the district court erred in holding otherwise. Yet Alabama case law does not support Nimbus's argument. Nimbus cites language in Messick discussing the imposition of liability on persons exercising "excessive control" and

referring to "dominating part[ies]," 514 So. 2d at 894, and argues that the case stands for the proposition that anybody exercising excessive control of a corporation may be held liable by piercing the corporate veil. Messick, however, dealt with an attempt to impose liability on the shareholders of a corporation. Id. at 893. Nimbus cites Cohen for the same proposition, yet Cohen also involved an attempt to hold a shareholder liable, not a creditor. 318 So. 2d at 280.

Nimbus also cites dicta from a Fifth Circuit case stating that "[i]f a lender becomes so involved . . . that it is in fact actively managing the debtor's affairs, then the quantum of control necessary to support liability under the 'instrumentality' theory may be achieved." Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp., 483 F.2d 1098, 1105 (5th Cir. 1973). Yet the Krivo court did not cite any Alabama law in support of that statement, and the court ultimately did not impose liability on the creditor. Id. at 1109. Because Alabama law offers no support for Nimbus's argument that it may pierce the corporate veil against a creditor, we find that the district court properly determined that the doctrine of piercing the corporate veil may not be used to impose liability on Geer.[3]

_____

[3] Nimbus also argues that even if the remedy of piercing the corporate veil is not available against a creditor, there is a genuine issue of material fact as to whether Geer was a creditor or an equity holder of SunnData. A review of the record shows that this argument was not raised in the district court, and accordingly, it is waived. See United States v. Anderton, 136 F.3d 747, 751 n.3 (11th Cir. 1998) (per curiam). Moreover, Nimbus concedes in its brief that "neither Geer nor Tarasevich were officers, agents, or owners of SunnData." Appellant's Brief at 27.

B.  Intentional Interference With Business Relations

To establish a claim for intentional interference with business relations, a plaintiff must show, inter alia, "that the defendant is a 'third party,' i.e., a 'stranger' to the contract with which the defendant allegedly interfered." Tom's Foods, Inc. v. Carn, 896 So. 2d 443, 454 (Ala. 2004) (citation omitted).  A defendant is not a stranger to a business or contractual relationship if the defendant "has any beneficial or economic interest in, or control over, that relationship."  Id. (citation omitted); see also Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So. 2d 1143, 1157 (Ala. 2003) ("One cannot be guilty of interference with a contract even if one is not a party to the contract so long as one is a participant in a business relationship arising from interwoven contractual arrangements that include the contract.").

Nimbus has failed to present any evidence that Geer was a stranger to Nimbus's business relationship with SunnData.[4]  Evidence submitted by Nimbus established that Geer loaned approximately $117,000 to SunnData during the course of SunnData's business relationship with Nimbus.  Because of his loan to SunnData, Geer had an economic interest in SunnData's success, including its

---

[4] Nimbus's brief does not address whether the defendants other than Geer were strangers to the business relationship between Nimbus and SunnData.  Accordingly, Nimbus has waived the issue.  See Farrow v. West, 320 F.3d 1235, 1242 n.10 (11th Cir. 2003) (issue not argued in brief is waived).

10

business relationship with Nimbus. Furthermore, after lending those funds to SunnData, Geer became involved in SunnData's business decisions. Because evidence submitted by Nimbus shows that Geer had an economic interest and was involved in the relationship between SunnData and Nimbus, the district court correctly determined that Geer was not a stranger to that relationship. See Tom's Foods, 896 So.2d at 454-55. Accordingly, Nimbus cannot establish an essential element of its intentional interference claim, no genuine issue of fact exists for trial, and summary judgment in favor of the defendants was appropriate. See id.

## III. CONCLUSION

Nimbus appealed the district court's grant of summary judgment in favor of the defendants on Nimbus's attempt to pierce the corporate veil and Nimbus's claim for intentional interference with business relations. Because, under Alabama law, a plaintiff may not pierce the corporate veil against a creditor, the district court properly granted summary judgement in favor of the defendants on that issue. Moreover, because Geer was not a stranger to the business relationship between Nimbus and SunnData, summary judgment was appropriate as to that count as well. Accordingly, we **AFFIRM** as to both issues.

11

BLACK, Circuit Judge, specially concurring:

I concur in the result reached by the majority. I write separately to express my interpretation of Alabama law on "piercing the corporate veil" with respect to creditors. The majority suggests that, under Alabama law, a creditor can never be liable for a debtor's obligations under a theory of piercing the corporate veil. I disagree.

In my view, Alabama law does extend liability under a veil-piercing theory to a creditor where the creditor exercises actual and total control over the debtor corporation. *See Krivo Indus. Supply Co. v. Nat'l Distillers &Chem. Corp.*, 483 F.2d 1098, 1104-06 (5th Cir. 1973).[1] In *Krivo,* the Fifth Circuit announced two elements for determining liability under the "instrumentality" doctrine: (1) "the dominant corporation must have controlled the subservient corporation" and (2) "the dominant corporation must have proximately caused [the] plaintiff harm through misuse of this control." *Id.* at 1103. Elaborating on the first element*,* the Court explained that "the fact that the allegedly dominant corporation held *no* stock ownership interest in the allegedly subservient corporation has not precluded application of the 'instrumentality' rule where actual and total control has been

---

[1]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

otherwise established." *Id.* at 1104 (emphasis in original). Further, as the majority acknowledges, the Court stated that "[i]f a lender becomes so involved with its debtor that it is in fact actively managing the debtor's affairs, then the quantum of control necessary to support liability under the 'instrumentality' theory may be achieved." *Id.* at 1105. The question, therefore, is one of control, regardless of whether the control was exercised by virtue of stock ownership, advances of credit, or otherwise.[2]

While I recognize *Krivo* did not cite Alabama case law for these propositions, the Court was bound to apply Alabama substantive law, and the Court explained that Alabama law had not yet delineated a precise test for determining liability. *Id.* at 1101, 1103. Further, the Court's language concerning lender liability under an instrumentality theory is not merely dicta, as it is part of the rule of law the Court applied to determine the liability of the defendant-creditor. It was, therefore, necessary to deciding the case before it.[3] Although the Court ultimately did not impose liability on the defendant-creditor, its conclusion

---

[2]In *Krivo*, the creditor and the debtor were both corporations, whereas in the instant case, the creditor is an individual. *Krivo*, 483 F.2d at 1101. This distinction, however, does not affect the applicability of *Krivo* to the instant case.

[3]Naturally, before determining whether the defendant-creditor, National Distillers and Chemical Corp., Inc., *was* liable, the Court had to determine whether it *could* be liable. Given National Distillers' status as a creditor, the Court had to decide whether it exercised "the quantum of control necessary to support liability under the 'instrumentality' theory." *Krivo*, 483 F.2d at 1105.

was based not on the defendant's lack of stock ownership in the debtor corporation, but instead on the defendant's lack of control over the debtor corporation. *Id.* at 1109. Further, the Alabama Supreme Court has since cited *Krivo* as precedential authority when discussing the instrumentality theory. *See Kwick Set Components, Inc. v. Davidson Indus., Inc.*, 411 So. 2d 134, 136 (Ala. 1982). Although some jurisdictions deem an ownership interest a prerequisite to instrumentality or alter ego liability, *Krivo* demonstrates that Alabama is not one of those jurisdictions.

Nonetheless, I do not think the evidence raises a genuine dispute that Geer exercised actual, participatory, and total control of SunnData as required under *Krivo*. *Krivo*, 483 F.2d at 1105. Geer merely took an active part in the management of SunnData and, at most, had a controlling influence on the affairs of SunnData. Under *Krivo*, this is not sufficient for liability. *Id.* at 1105, 1106. Accordingly, while my interpretation of Alabama law differs from the majority's, I concur in the result.